IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER N. BELCASTRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: |
| v. | ) | |
| | ) | |
| UNITED AIRLINES, INC., a | ) | Jury demanded on all counts |
| Delaware corporation, and JAMES | ) | |
| SIMONS, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Christopher N. Belcastro ("Belcastro"), by his attorneys, Jordan A. Finfer, Margherita M. Albarello, and Di Monte & Lizak, LLC, for his complaint against United Airlines, Inc. ("United"), and James Simons ("Chief Pilot Simons"), states as follows:

### Nature of the Claim

1. This is an action for race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"), termination in violation of the Railway Labor Act, 45 U.S.C. §151 *et seq.*, violation of the Illinois Personnel Record Review Act, 820 ILCS 40/1 *et seq.*, defamation, and tortious interference with employment.

### Parties

2. Belcastro is a White citizen of the United States and a resident of Ohio. Belcastro became an employee of United in April 2015, and worked continuously for United as a pilot until March 25, 2016, when Chief Pilot Simons, Black, terminated Belcastro because of his race, White, and because of his union activities.

3. United is a Delaware corporation with its corporate headquarters in Cook County,

Illinois, within this judicial district. On information and belief, Chief Pilot Simons is a resident of the State of Texas, who, on information and belief, has substantial contacts with the State of Illinois, including by manner of flying in and out of O'Hare Airport, Chicago, Illinois, in connection with his United employment.

**Jurisdiction**

4. The Court has jurisdiction over this case pursuant to federal question jurisdiction, 28 U.S.C. §1331. The Court has supplemental jurisdiction over the state law claims through 28 U.S.C. §1367 because these claims are so related to Belcastro's original jurisdiction claims that they form part of the same case or controversy under Article III of the United States Constitution.

**Venue**

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events complained of herein occurred in this judicial district, United had awarded Belcastro a bid such that his trips would start and end at Chicago, O'Hare Airport, and, on information and belief, Belcastro's employment records are maintained by United in this judicial district.

**Procedural History**

6. Belcastro filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), designated Charge No. 570-2017-00662N. A copy of the charge is attached hereto as Exhibit A. On or about January 27, 2017, the EEOC issued Belcastro a Notice of Right to Sue, a copy of which is attached hereto as Exhibit B. Belcastro has filed this Complaint within 90 days of his receipt of the notice and the Complaint is timely.

**Facts**

7. At all relevant times, Belcastro was an employee of United.

8. Belcastro began his employment with United on April 7, 2015 as a new hire First Officer pilot. Pursuant to United policy and United Pilot Agreement ("UPA") Section 6-C, Belcastro's first twelve months bid periods for United as a pilot were "probationary." Belcastro's probationary period would have ended on April 7, 2016.

9. The Airline Pilots Association, International (the "Association") represents more than 55,000 professional airline pilots in the United States and Canada. Prior to, and during, Belcastro's United employment, Belcastro actively participated in Association union activities. For example, beginning in 2007 and for several years thereafter before commencing employment with United, Belcastro was a volunteer on the Association National Organizing Task Force. In this position, Belcastro assisted with recruiting pilots employed by non-union airline carriers to vote in favor of joining the Association. Belcastro also held more anti-management positions within the Association. For example, he was the Cleveland (CLE) Local Executive Council (LEC) 176 Captain Representative for ExpressJet from March 1, 2009 through August 31, 2011. He was Master Executive Council (MEC) Chairman for ExpressJet from September 1, 2011 through October 2012. These positions placed Belcastro in the spotlight of management and his positions and activities were published in the Association monthly magazine, and Assocation publications. During his employment with United, Belcastro participated in Associate Local Council 172 meetings and was asked to consider becoming the Association's Liaison for the Cleveland Hopkins International Airport following completion of his probationary period with United.

10. Belcastro's union activities were known to United and others through a number of ways. For example, Belcastro's Linkedin profile lists his Association union activities. Additionally,

the Association and Local Council 172 publish email blasts to Association members describing union activities and identifying pilots engaged in these activities.

11. On or about February 22, 2016, Belcastro bid on a United vacancy bid for the 320 Airbus at Chicago, O'Hare Airport. Belcastro was awarded the bid on or about March 7, 2016. As a result of being awarded the bid, Belcastro's trips would start and end at Chicago, O'Hare Airport.

12. On the morning of March 3, 2016, United's crew scheduling department designated Belcastro as "Unable to Contact" (also referred to as an "UTC") for a reserve day flying assignment on March 3, 2016. Crew scheduling left two voice messages for Belcastro about the assignment on his cell phone. One message was left at about 5:56 p.m., and one message was left at about 9:45 p.m. The second message stated that crew scheduling was calling to remind him of his March 3 assignment, that Belcastro should call back, and that if he did not call back, crew scheduling would call him back after midnight. Crew scheduling did not call or leave messages on his home phone, despite having his home phone number and despite its practice of previously calling and leaving messages on Belcastro's home phone about flying assignments. Belcastro received the voice messages and prepared to fulfill the flying assignment. Belcastro did not acknowledge the assignment, however, because he was advised during his new hire Basic Indoctrination Course of United's practice of contacting reserves just after midnight who had unconfirmed assignments, and because the second voice message stated that if Belcastro did not call crew scheduling, it would call him after midnight.

13. The Unable to Contact designation meant that Belcastro would be docked pay he otherwise would have received for a period of work equal to 4 hours, 3 minutes, and 20 seconds.

14. By letter dated March 3, 2016, Flight Manager Jonathan Sawyer ordered Belcastro

4

to appear before Chief Pilot Simons on March 17, 2016. Sawyer reports to Chief Pilot Simons.

15. On or about March 3 or 4, 2016, Belcastro explained to his Association representatives, including James McGuire, Andy Collins, and Scott Cornelison, that he never received a post-midnight confirmation call from crew scheduling regarding the reserve flying assignment of March 3, despite the fact that crew scheduling had made post-midnight confirmation calls to him on prior occasions. Collins told Belcastro that Chief Pilot Simons "does not like the union."

16. The Association asked a crew scheduling representative to review the Unable to Contact designation and to remove it from Belcastro's master schedule. On or about March 7, 2016, crew scheduling supervisor Victor Santiago agreed that the Unable to Contact designation was not justified under the circumstances and removed the notation from Belcastro's master schedule.

17. On Monday, March 7, 2016, Andy Collins sent an email to Chief Pilot Simons advising him that:

> "[The Association] was able to have the 'UTC' removed from First Officer Chris Belcastro's master schedule and record. I understand you may still want to talk with Chris and have told him such. I just wanted to give you a heads up because we've been having issues throughout the system with the crew desk improperly assigning 'UTC' for this exact issue. We have confirmed with our scheduling SMEs and negotiators that pilots are not required to call the crew desk on their day off prior to starting reserve. Pilots are also not required to be phone available prior to beginning their reserve assignment."

18. On or about March 9, 2016, Chief Pilot Simons instructed the Director of Labor Relations to reinstate the Unable to Contact notation into Belcastro's master schedule. As a result, the Unable to Contact notation was reinstated.

19. On or about March 13, 2016, Jonathan Sawyer looked up Belcastro's Linkedin profile, which profile described Belcastro's union activities.

20. On or about March 17, 2016, Belcastro appeared before Chief Pilot Simons and Human Resources representative Donna Titmus, pursuant to the order to appear letter dated March 3, 2016. Belcastro was accompanied by Association Grievance Committee Member George Riley. During the meeting, Chief Pilot Simons acknowledged that he had reviewed all of Belcastro's probationary pilot reports and that they were outstanding. Simons stated that Belcastro would receive a Letter of Counsel.

21. On March 24, Chief Pilot Simons asked Belcastro to meet with him at United's Cleveland, Ohio Chief Pilot office the following day. On Friday, March 25, 2016, Chief Pilot Simons met with Belcastro, accompanied by his union representative, James McGuire. Chief Pilot Simons asked McGuire if he could wait in the waiting area while Simons and Belcastro had a discussion alone. Belcastro and McGuire told Chief Pilot Simons that he and Belcastro could meet alone as long as no discipline was going to be issued during the meeting. In turn, Chief Pilot Simons introduced McGuire to Titmus who was working in another office, and Chief Pilot Simons and Belcastro proceeded with their private meeting.

22. Once in the Chief Pilot's office, Chief Pilot Simons stated "you now why we are here today. Prior to coming to United, you had a lot of ALPA experience, so you know how this process works." Simons then gave Belcastro a letter dated March 25, 2016, stating:

> "United is offering you the opportunity to end your employment on amicable terms, effective as of midnight on March 25, 2016. If you sign this letter below, United will accept your resignation, effective March 25, 2016. Please return all Company property in your possession."

Chief Pilot Simons told Belcastro that he had five (5) minutes to sign the letter or be terminated. Belcastro told Simons "I want union representation with me before I sign anything." In response, Simons stated "The only way you will be having union representation with me is through the

termination process. If you leave the office, the resignation letter is no longer an option." When Belcastro asked why he was being terminated when the previous week Chief Pilot Simons had only issued Belcastro a Letter of Counsel, Simons said "I changed my mind, this is my final decision. I don't know why we hire pilots like you."

23. Belcastro then spoke with his business agent, James McGuire. The two went back to see Chief Pilot Simons. Belcastro pleaded with Simons to give him a last chance agreement rather than terminating him. Chief Pilot Simons refused, responding, "there are thousands of pilots who want the opportunity you had and will make sure they never miss a day of work. My Black friend who flies Air Force One would love to be a pilot at United, but, for some reason, hasn't gotten hired yet. Now, are you going to sign the resignation letter or are we going to go through the termination process?" Belcastro signed the March 25, 2016 letter and gave it to United. Belcastro asked Chief Pilot Simons for his probationary pilot reports. Simons said he would send Belcastro the reports on Monday. Belcastro did not receive the probationary pilot reports on Monday, and contacted Titmus about the reports. She responded that the "flight office" (Chief Pilot Simons is in charge of the flight office) destroyed the reports.

24. United coded the end of Belcastro's employment as a "termination" even though Chief Pilot Simons told Belcastro that if he signed the March 25, 2016 letter the end of his employment would be considered a resignation.

25. Chief Pilot Simons forced Belcastro to resign because he is White.

26. Similarly situated White pilots whose employment status is controlled by White Chief Pilots have not been forced to resign and have not been terminated.

27. Chief Pilot Simons forced Belcastro to resign because of his union activities.

7

28. United published Belcastro's termination to third parties. United did so without written notice to Belcastro in violation of the Illinois Personnel Record Review Act, 820 ILCS 40/7.

29. United's coding of Belcastro's separation from employment as a "termination" constitutes a serious aspersion about the professionalism, character, and employment of Belcastro and an aspersion on Belcastro's professionalism, character, and employment are bound to have a serious negative effect on Belcastro's occupation and profession as a pilot.

## COUNT I
## Jury Demanded
## Race discrimination in violation of Title VII

30. Belcastro incorporates and realleges herein ¶¶ 1-29 of the Complaint.

31. United engaged in intentional race discrimination in the terms and conditions of Belcastro's employment, including, but not limited to, his termination, in violation of Title VII.

32. Prior to receiving the Unable to Contact notation, Belcastro had never been disciplined or warned of performance issues and he met United's legitimate performance expectations. United's stated reason for its termination of Belcastro was not the true reason, but, instead, was a pretext to hide Chief Pilot Simon's discriminatory animus.

33. United's discriminatory conduct has caused Belcastro to suffer a loss of pay, benefits, and prestige.

34. United's discriminatory conduct has caused Belcastro to suffer mental and emotional distress, entitling him to compensatory damages under 42 U.S.C. §1981a(b)(3).

35. United engaged in discriminatory practices with malice and reckless indifference to Belcastro's federally-protected rights, thereby entitling him to punitive damages under 42 U.S.C. §1981a(b).

WHEREFORE, Belcastro prays for a judgment as follows:

1. That the Court order United to reinstate his employment;

2. That the Court grant full front pay and other employment benefits to him;

3. That the Court grant full back pay and other employment benefits to him;

4. That the Court grant him compensatory damages for the humiliation, emotional distress, and other damages caused by United's conduct;

5. That the Court grant him punitive damages for United's malicious and reckless indifferent conduct;

6. That the Court grant him expenses of litigation, including reasonable attorneys' fees and costs.

7. That the Court grant him all other relief the Court deems just and proper.

## COUNT II
### Jury Demanded
### Wrongful discharge in violation of the Railway Labor Act

36. Belcastro incorporates and realleges herein ¶¶ 1-35 of the Complaint.

37. Belcastro engaged in protected union activities.

38. Chief Pilot Simons and United knew of Belcastro's involvement in protected union activities.

39. Chief Pilot Simons and United harbored animus toward Belcastro's involvement in protected union activities.

40. There was a causal connection between Chief Pilot Simons' and United's animus and Belcastro's forced resignation.

WHEREFORE, Belcastro prays for a judgment as follows:

1. That the Court order United to reinstate his employment;

2. That the Court grant full front pay and other employment benefits to him;

3. That the Court grant full back pay and other employment benefits to him;

4. That the Court grant him compensatory damages for the humiliation, emotional distress, and other damages caused by United's conduct;

5. That the Court grant him punitive damages for United's malicious and reckless indifferent conduct;

6. That the Court grant him expenses of litigation, including reasonable attorneys' fees and costs.

7. That the Court grant him all other relief the Court deems just and proper.

## COUNT III
## Jury Demanded
## Violation of the Illinois Personnel Record Review Act

41. Belcastro incorporates and realleges herein ¶¶ 1-40 of the Complaint.

42. The Illinois Personnel Record Review Act provides at 820 ILCS 40/7:

(1) An employer or former employer shall not divulge a disciplinary report, letter of reprimand, or other disciplinary action to a third party, to a party who is not a part of the employer's organization, or to a party who is not a part of a labor organization representing the employee, without written notice as provided in this Section.

(2) The written notice to the employee shall be by first-class mail to the employee's last known address and shall be mailed on or before the day the information is divulged.

43. Belcastro did not specifically waive his right to the written notice described in 820 ILCS 40/7(2).

44. United's publication of its coding of Belcastro's separation from employment as a "termination" violated the Illinois Personnel Record Review Act.

45.     United willfully and knowingly violated the Illinois Personnel Record Review Act.

WHEREFORE, Belcastro prays for a judgment as follows:

1.      That the Court order United to comply with the Illinois Personnel Record Review Act;

2.      That the Court grant actual damages, $200.00, reasonable attorneys' fees, and costs to Belcastro;

3.      That the Court grant him all other relief the Court deems just and proper.

## COUNT IV
### Jury Demanded
### Defamation - Against United and Chief Pilot Simons

46.     Belcastro incorporates and realleges herein ¶¶ 1- 45 of the Complaint.

47.     United's published statement that Belcastro was terminated was a false statement about Belcastro, the statement was an unprivileged communication, and the publication harmed Belcastro.

48.     United's publication of the false statement was made with the intent to injure Belcastro or made in reckless disregard of Belcastro's rights.

WHEREFORE, Belcastro prays for a judgment as follows:

1.      That the Court grant full front pay and other employment benefits to him;

2.      That the Court grant full back pay and other employment benefits to him;

3.      That the Court grant him compensatory damages for the humiliation, emotional distress, and other damages caused by United's conduct;

4.      That the Court grant him punitive damages for United's malicious and reckless indifferent conduct;

5. That the Court grant him expenses of litigation, including reasonable attorneys' fees and costs.

6. That the Court grant him all other relief the Court deems just and proper.

## COUNT V
### Jury Demanded
### Tortious Interference with Employment - Against Chief Pilot Simons

49. Belcastro incorporates and realleges herein ¶¶ 1-48 of the Complaint.

50. Belcastro had a reasonable expectation of continued employment with United.

51. Chief Pilot Simons knew of Belcastro's expectancy.

52. Chief Pilot Simons' wrongful conduct interfered with Belcastro's reasonable expectation of continued employment with United and prevented it from ripening into continued employment.

53. Chief Pilot Simons' wrongful conduct proximately caused damages to Belcastro.

WHEREFORE, Belcastro prays for a judgment as follows:

1. That the Court order United to reinstate his employment;

2. That the Court grant full front pay and other employment benefits to him;

3. That the Court grant full back pay and other employment benefits to him;

4. That the Court grant him compensatory damages for the humiliation, emotional distress, and other damages caused by United's conduct;

5. That the Court grant him punitive damages for United's malicious and reckless indifferent conduct;

6. That the Court grant him expenses of litigation, including reasonable attorneys' fees and costs.

7. That the Court grant him all other relief the Court deems just and proper.

                                        Respectfully submitted,

                                        Christopher N. Belcastro

                          By:    /s/ Margherita M. Albarello
                                  Margherita M. Albarello, one of his attorneys

Jordan A. Finfer, Esq.
ARDC #6296373
Margherita M. Albarello, Esq.
ARDC# 6187375
Di Monte & Lizak, LLC
216 W. Higgins Road
Park Ridge, IL 60068
(847) 698-9600
Fax: (847) 698-9624
jfinfer@dimontelaw.com
malbarello@dimontelaw.com