IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER N. BELCASTRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17-cv-01682 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| UNITED AIRLINES, INC. and ) | |
| JAMES SIMONS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Belcastro claims that he was unlawfully terminated from his position as a pilot for Defendant United Airlines, Inc. ("United") because of his race and union activities. Now before the Court are Defendants United and James Simons's motion to transfer venue (Dkt. No. 13) and partial motion to dismiss (Dkt. No. 16). For the reasons explained below, Defendants' motion to transfer is denied and the partial motion to dismiss is granted.

## BACKGROUND[1]

Belcastro started working for United on April 7, 2015 as a new hire First Officer pilot. (Compl. ¶ 8, Dkt. No. 1.) Belcastro resides in Ohio and worked out of Dulles International Airport in Dulles, Virginia during his employment with United. (*Id.* ¶¶ 2, 6, Ex. A). Pursuant to United policy and the United Pilot Agreement, Belcastro spent his first 12 months on probation—a period that was set to end on April 7, 2016. (*Id.*) Prior to and during Belcastro's employment, he was an active participant in the Air Line Pilots Association, International

---

[1] Unless otherwise indicated, the following facts are taken from Belcastro's complaint. For the purpose of deciding the partial motion to dismiss, this Court accepts these facts as true and views them in the light most favorable to Belcastro. *See, e.g.*, *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009).

("Association"), a union that represents more than 55,000 professional airline pilots in the United States and Canada (*Id.* ¶ 9.) According to Belcastro, his affiliation with the Association was well known amongst United's management. (*Id.* ¶ 10.)

In February 2016, Belcastro applied for a pilot vacancy in a 320 Airbus that flew out of Chicago's O'Hare Airport. (*Id.* ¶ 11.) He was awarded the position on or about March 7, 2016. (*Id.*) As a result, Belcastro's flights would start and end at O'Hare Airport. (*Id.*)

Meanwhile, on March 2, 2016, United's crew-scheduling team attempted to contact Belcastro about a reserve flying assignment for which he was scheduled the following day. The crew left Belcastro two messages on his cell phone—one at 5:56 p.m. and the other at 9:45 p.m. (*Id.* ¶ 12.) The second message stated that the crew was calling to remind Belcastro of his March 3, 2016 assignment and asked him to call back. (*Id.*) The message also stated that if Belcastro did not call back, the crew-scheduling team would call again at midnight. (*Id.*) The crew did not call Belcastro back at midnight, however, and Belcastro never acknowledged the assignment. (*Id.*) Nonetheless, as he did receive the voice messages, Belcastro was prepared to fulfill the flying assignment. (*Id.*)

On the morning of March 3, 2016, United's crew-scheduling department designated Belcastro as Unable to Contact ("UTC") for the reserve-day flying assignment. (*Id.*) The UTC designation meant that Belcastro's pay would be docked. (*Id.* ¶ 13.) That same day, Flight Manager Jonathan Sawyer ordered Belcastro to appear before Chief Pilot James Simons on March 17, 2016 to discuss the UTC designation. (*Id.* ¶ 14.) Belcastro sought help from the Association regarding the issue, telling the union's representatives that he never received a post-midnight confirmation call from the crew-scheduling team. (*Id.* ¶ 15.) The Association asked a crew-scheduling representative to review the UTC designation and to remove it from Belcastro's

2

file. A crew-scheduling supervisor agreed that the UTC designation was not justified under the circumstances and removed the notation from Belcastro's master file. (*Id.* ¶ 16.) Shortly afterwards, however, Simons instructed the director of labor relations to reinstate the UTC notation on Belcastro's record. (*Id.* ¶ 18.)

On March 17, 2016, Belcastro, accompanied by an Association representative, appeared before Simons and Human Resources representative Donna Titmus. (*Id.* ¶ 20.) During that meeting, Simons told Belcastro that he would receive a Letter of Counsel as punishment for his UTC infraction. (*Id.* ¶ 20.) Belcastro and Simons met again on March 25, 2016 in Cleveland, Ohio. This time, however, Simons unexpectedly gave Belcastro a resignation letter. Simons told Belcastro that if he left the office without signing the letter, he would be terminated. (*Id.* ¶ 22.) Belcastro pleaded with Simons to give him a "last-chance agreement" instead of terminating him, but Simons responded by telling Belcastro that, "there are thousands of pilots who want the opportunity you had and will make sure they never miss a day of work. My Black friend who flies Air Force One would love to be a pilot at United, but, for some reason, hasn't gotten hired yet. Now, are you going to sign the resignation letter or are we going to go through the termination process?" Belcastro then signed the letter. (*Id.* ¶ 23.)

Despite receiving a signed resignation letter, United coded the end of Belcastro's employment as a termination. (*Id.* ¶ 24.) Belcastro alleges that United published the false termination status to third parties, which has negatively affected his professional status. (*Id.* ¶¶ 28, 29.) Belcastro further claims that Simons, who is black, forced Belcastro to resign because he is white and participates in union activities. (*Id.* ¶¶ 25, 27.) According to Belcastro, similarly-situated white pilots whose employment status is controlled by white chief pilots have not been forced to resign. (*Id.* ¶ 26.) Additionally, Association representatives have told Belcastro that

3

Simons "does not like the union." (*Id.* ¶ 15.) For these reasons, Belcastro has filed the instant lawsuit against United and Simons alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. (Count I); wrongful discharge in violation of the Railway Labor Act, 45 U.S.C. § 141, *et seq.* (Count II); violation of the Illinois Personnel Record Review Act, 820 ILCS 40/0.01 *et seq*. (Count III); defamation (Count IV); and tortious interference with employment (Count V).

## DISCUSSION

### I. Motion to Transfer

The Court first must address the question of venue. Defendants seek to transfer this case to the Eastern District of Virginia.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." To prevail on their motion under § 1404(a), Defendants must show the following: "(1) venue is proper in this district; (2) venue [and jurisdiction are] proper in the transferee district; (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interest of justice." *Annett Holdings v. Certain Underwriters at Lloyds*, No. 08-cv-01106, 2008 WL 2415299, at *2 (N.D. Ill. June 12, 2008) (alteration in original) (quoting *Gueorguiev v. Max Rave, LLC*, 526 F. Supp. 2d 853, 856 (N.D. Ill. 2007)). In ruling on a § 1404(a) motion, the Court considers the relevant factors "in light of all the circumstances of the case;" this analysis "necessarily involves a large degree of subtlety and latitude," including with respect to the relative weight to give to each of the factors. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). The moving party bears the burden of

demonstrating that a transfer is warranted. *See Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989). Defendants have not satisfied their burden here.

### A. Venue in Transferor and Transferee Courts

The venue analysis begins with the questions of whether venue would be proper in the transferor district and the transferee district. The parties here do not dispute that venue is proper in the Northern District of Illinois. Belcastro, however, maintains that venue is not appropriate in the Eastern District of Virginia.

As the parties acknowledge, Section 5(f)(3) of Title VII is the exclusive venue provision for causes of action brought pursuant to that statute. *See* 42 U.S.C. § 2000e-5(f)(3); *see also Graham v. Spireon, Inc.*, No. 14-cv-00131, 2014 WL 3714917, at *2 (N.D. Ill. July 25, 2014) ("Title VII contains its own exclusive venue provision."). Pursuant to Section 5(f)(3), Title VII cases

> may be brought in [1] any judicial district in the State in which the unlawful employment practice is alleged to have been committed, [2] in the judicial district in which the employment records relevant to such practice are maintained and administered, or [3] in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought [4] within the judicial district in which the respondent has his principal office.

42 U.S.C.A. § 2000e-5(f)(3). Here, the Eastern District of Virginia qualifies as a "judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C.A. § 2000e-5(f)(3). Specifically, at the time he was constructively terminated, Belcastro was still two weeks away from completing his probationary term at Dulles Airport in the Eastern District Virginia. Therefore, but for his termination, Belcastro would have continued to work in the Eastern District of Virginia (albeit for only a relatively short period of

time). Accordingly, venue is proper in both the Northern District of Illinois and the Eastern District of Virginia.

### B. Convenience and the Interests of Justice

Because venue is proper in both the proposed transferor and transferee districts, the § 1404(a) analysis in this case turns on the convenience of the parties and the witnesses and the interests of justice. Those two inquiries are distinct. *See Coffey*, 796 F.2d at 220.

The Court considers five factors in evaluating the convenience of the parties and witnesses: "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties of litigating in the respective forums." *Law Bulletin Pub., Co. v. LRP Publications, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998).

The first factor, the plaintiff's choice of forum, generally deserves deference. *See Fed. Deposit Ins. Corp. v. Citizens Bank & Trust Co. of Park Ridge*, 592 F.2d 364, 368 (7th Cir. 1979). But when the plaintiff does not reside in his or her chosen forum, that factor is afforded substantially less deference. *See Johnson*, 2013 WL 323404, at *5. Here, Belcastro resides in Ohio, not Illinois, and so his decision to bring suit in this District will be given less weight than it would otherwise. Notably, this is not a situation where the plaintiff would have been unable to bring suit in the district where he resides due to the limitations of the venue statute—the Northern District of Ohio would also have been a proper venue under Section 5(f)(3), since that was the location of Belcastro's meeting with Simons where he was forced to resign and thus represents the "district in which the unlawful employment practice is alleged to have been committed."

The second convenience factor, the situs of material events, points in multiple directions. The heart of this lawsuit is Belcastro's forced resignation, which occurred in the Northern District of Ohio, a venue neither side desires. According to Belcastro, the UTC designation—which provided the alleged pretext for his termination—was generated by United's crew-scheduling team in Illinois. Furthermore, Belcastro claims he felt the effects of Defendants' unlawful conduct in Illinois because, but for the termination, he would have worked out of O'Hare Airport in Chicago. On the other hand, if Belcastro had not been terminated on March 25, 2016, he would have worked in the Eastern District of Virginia for two more weeks while he completed his probationary period. It further appears as though the March 17, 2016 disciplinary meeting with Simons to discuss Belcastro's UTC designation occurred at Dulles airport. Because there is no single place where the material events in this case occurred, the second factor is neutral.

The third factor, ease of access to proof, is also neutral. "When documents are easily transferable, access to proof is a neutral factor." *First Nat. Bank v. El Camino Res., Ltd.*, 447 F. Supp. 2d 902, 912 (N.D. Ill. 2006). Now that documents relevant to a complex litigation can easily be transmitted great distances in electronic format, this factor is rarely material to a § 1404(a) analysis. Moreover, "[t]his is not a case in which the parties need access to non-documentary proof located in another forum." *Stanley v. Marion*, No. 04-cv-00514, 2004 WL 1611074, at *3 (N.D. Ill. July 16, 2004). Following his termination, Belcastro's personnel records appear to have been relocated to Houston, Texas, another location where neither side seeks to litigate. To the extent that any policy, personnel, or other relevant documents remain in Virginia or Illinois, there is no reason why those documents cannot easily be transferred to the

appropriate venue. *See Nero v. Am. Fam. Mut. Ins. Co.*, No. 11-cv-01072, 2011 WL 2938138, at *3 (N.D. Ill. July 19, 2011).

The fourth and fifth factors, the convenience of the parties and witnesses, weigh against transfer. While this is not Becastro's home district, the Northern District of Illinois is still plainly more convenient for him. For example, Belcastro notes that he chose to bring suit here because his parents live in Illinois, so he would able to attend court hearings without incurring lodging costs as he would if the case is transferred to the Eastern District of Virginia. Additionally, Belcastro's attorneys are located in Chicago. While transferring the case to Virginia would significantly increase Belcastro's litigation expenses, it is difficult to see how transfer would have a similar effect on United. After all, the airline is headquartered in Chicago, less than a mile from the federal courthouse in the Northern District of Illinois.

While Defendants counter that a number of the witnesses in this action are located in or around Virginia, two of the witnesses that they identify, Jonathan Sawyer and Simons, are current United employees. The convenience of those party-witnesses is afforded less weight than if they were neutral third-party witnesses since it is presumed that they will appear voluntarily, particularly given that the trial would take place walking distance from their employer's headquarters. *See First Nat. Bank*, 447 F. Supp. 2d at 913. The third witness that Defendants identify as relevant to the convenience inquiry is Titmus, who is now a former United employee residing in Virginia. Although Titmus is outside of this Court's subpoena power, *see* Fed. R. Civ. P. 45(c)(1)(A), United has presented no reason for the Court to assume that she would not travel to Chicago for a trial. Certainly United, a major airline, would have the means to arrange for Titmus's travel. And even if she refused to come, Titmus is only one witness and United has not

8

shown that her testimony is so essential to this case that it would be prejudiced if she could not testify in person rather than by deposition or perhaps live by videoconference.

Taken together, the convenience factors weigh against transfer. Meanwhile, the interest of justice factor is largely neutral. This factor allows courts to consider the most efficient means of administering the case. "[C]ourts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Research Automation, Inc. v. Schrader-Bridgeport Intern., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). The first of those factors, docket congestion and speed to trial, slightly favors transfer. To assess the relative speed with which the case will be resolved, a court may look to the Federal Court Management Statistics for the median months from filing to disposition and the median months from filing to trial. *Powell v. Sparrow Hosp.*, No. 09-cv-03239, 2010 WL 582667, at *5 (N.D. Ill. Feb. 12, 2010) (internal quotation marks omitted). The median months from filing to disposition is slightly different in the two venues under consideration here—in the Eastern District of Virginia it is 5.3 months and in the Northern District of Illinois it is 8.2 months.[2] However, the median months from filing to trial differs more drastically—in the Eastern District of Virginia it is only 10 months, while in the Northern District of Illinois it is 40 months. *Id.*

With respect to each court's familiarity with Illinois law, the issue is largely neutral at this stage in the litigation, especially since all federal courts are well-equipped to analyze and assess foreign law. *See Tawil v. Ill. Tool Works Inc.*, No. 15-cv-06808, 2015 WL 7889036, at *4 (N.D. Ill. Dec. 4, 2015) (noting that "federal judges routinely interpret law from a wide variety of

---

[2] *See* Federal Court Management Statistics, June 2017, District Courts, *available at* http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0630.2017.pdf.

jurisdictions"). To the extent the Court gives any weight to this factor, it would be in favor of denying the motion to transfer, since federal judges sitting in Illinois generally may be presumed to have presided over more cases under Illinois state law than federal judges in Virginia. *See id.* (recognizing that New Jersey courts are more likely to be familiar with New Jersey law than Illinois courts). As for Belcastro's federal claims, judges in this District and in the Eastern District of Virginia should be equally familiar with the federal discrimination statutes at issue here.

The final two factors, the respective desirability of resolving this controversy in each locale and the relationship of each community to the controversy, slightly favor litigation in the Northern District of Illinois. As Belcastro points out, but for his termination he would have worked at Chicago's O'Hare Airport and therefore the effects of his termination were felt in the Northern District of Illinois. This District also has a significant interest in the case because United is headquartered in Chicago. *See Sojka v. DirectBuy, Inc.*, No. 12-cv-09809, 2014 WL 1089072, at *5 (N.D. Ill. Mar. 18, 2014). Defendants argue that the Eastern District of Virginia also has an interest in the resolution of this case since United operates within the State of Virginia. This Court does not deny that Virginia has some interest in the case. But there is a difference in the degree of interest—United operates in many states but it only has one headquarters. Further, while both Belcastro and his supervisors worked in Virginia during the relevant time period for this case, it is unclear how important that fact may be given that the termination decision at the center of this lawsuit occurred in Cleveland, Ohio. In sum, the interest of justice factors and the convenience factors slightly weigh against transfer.

Transfer may only be ordered if the balance of factors strongly favors the Defendants' proposed forum. *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663–64 (7th Cir. 2003) ("[U]nless

10

the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Defendants have not met this burden. Consequently their motion to transfer is denied.

### II. Motion to Dismiss

Having determined that Belcastro's action will remain in this District, the Court next turns to the merits of his claims. Defendants have moved to dismiss Counts II through V of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Defendants also move to dismiss Counts II and III under Rule 12(b)(1) for lack of subject-matter jurisdiction. In resolving challenges to subject-matter jurisdiction, the Court must first determine whether Defendants are making a facial or factual attack. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A factual attack on subject-matter jurisdiction occurs where a defendant contends "there is in fact no subject[-]matter jurisdiction, even if the pleadings are formally sufficient." *Id.* (internal quotation marks omitted). When evaluating a factual attack, "the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Id.* By contrast, a facial attack argues that the plaintiff has not

alleged a basis for subject-matter jurisdiction on the face of the complaint. *Id.* The court must evaluate a facial attack by "accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in favor of the plaintiff." *Id.*

### A. Count II: Wrongful Discharge in Violation of the Railway Labor Act

Defendants argue that Belcastro's wrongful discharge claim should be dismissed as a minor dispute under the RLA for which the Court lacks subject-matter jurisdiction. Here, Defendants have introduced evidence outside of the complaint in support of their argument, and the Court will therefore treat Defendants as making a factual attack on jurisdiction.

The RLA provides a comprehensive framework for resolving labor disputes in the railroad and airline industries. *Brown v. Ill. Ctr. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001). Under the RLA, all minor disputes "must be adjudicated under RLA mechanisms, which include an employer's internal dispute-resolution procedures and an adjustment board established by the unions and the employer." *Id*. Minor disputes are "subject to mandatory and exclusive arbitration." *Id.* A minor dispute arises "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. §153. In other words, "[m]inor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994). Consequently, if "resolution of the plaintiff's claim requires interpretation" of the collective bargaining agreement, it is subject to mandatory and exclusive arbitration under the RLA. *Brown*, 254 F.3d at 658.

Belcastro contends that the RLA does not preempt Belcastro's wrongful discharge claim because he was a probationary pilot at the time of his termination and therefore not subject to the collective bargaining agreement. According to the collective bargaining agreement, however,

12

United may end a probationary pilot's employment at any time during his probationary period, regardless of his position on the seniority list. (*See* Mem. in Supp. of Mot. to Dismiss, Ex. B, Collective Bargaining Agt. § 6-C, Dkt. No. 17.) Thus, the collective bargaining agreement clearly establishes at-will employment for probationary employees. This clause is part of the larger bargained-for agreement between United and the Association. Allowing Belcastro to rely on his probationary status to avoid preemption by the RLA would undermine the union's right exclusively to bargain on behalf of airline pilots. *See Black v. Atl. Se. Airlines, Inc.*, 851 F. Supp. 465, 468 (N.D. Ga.), *aff'd sub nom. Black v. Atl. S.E. Airlines*, 37 F.3d 638 (11th Cir. 1994) (finding that the RLA applied to plaintiff's case, even though he was a probationary employee, because the collective bargaining agreement at issue clearly addressed probationary employees, defining their employment as at-will); *Adams v. Nw. Airlines, Inc.*, No. 87-cv-72421, 1988 WL 156337, at *3 (E.D. Mich. Aug. 18, 1988) (holding that the plaintiff's probationary status did not affect the applicability of the RLA). Therefore, regardless of his probationary status, Belcastro's wrongful discharge claim is preempted by the RLA and must be dismissed.

### B. Count III: Illinois Personnel Record Review Act

In Count III, Belcastro alleges that Defendants violated IPRRA, which precludes an employer from divulging an employee's disciplinary record to a third party. *See* 820 ILCS 40/7. In their motion to dismiss, Defendants contend that IPRRA requires plaintiffs to exhaust their administrative remedies with the Department of Labor before pursuing claims in court. The Court declines to address this administrative exhaustion argument, however, because it finds that IPRRA does not provide a cause of action to employees who live and work outside of Illinois.

While Defendants argue that the fact that Belcastro neither worked nor resided in Illinois speaks to the Court's subject-matter jurisdiction, their argument relies upon a statute, 820 ILCS

40/12(c), that appears to address the proper venue for claims rather than establish jurisdiction. Nor do Defendants challenge that this Court's federal-question jurisdiction over Belcastro's Title VII claims provides a basis for the exercise of supplemental jurisdiction over this state law claim. Instead, their challenge is better understood as one pursuant to Rule 12(b)(6); specifically, the issue is whether Becastro can state a claim under IPRRA given that he neither lives nor works in Illinois. As Defendants point out, Illinois has a "long-standing rule of construction . . . that a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005). Indeed, several courts have determined that other Illinois employment law statutes do not protect out-of-state residents who performed their work out of state as well, even when the work was performed for an Illinois employer. *E.g.*, *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (Illinois Wage Payment and Collection Act); *Wooley v. Bridgeview Bank Mortg. Co., LLC*, No. 14 C 5757, 2015 WL 327357, at *2 (N.D. Ill. Jan. 23, 2015) (Illinois Minimum Wage Law); *see also Hirst v. Skywest, Inc.*, No. 15 C 02036, 2016 WL 2987678, at *8 (N.D. Ill. May 24, 2016) (Illinois Minimum Wage Law; employer only registered to do business in Illinois).

There is nothing in IPRRA that expresses a clear intent that the statute be applied extraterritorially. While it is true that IPRRA does not contain any geographical restrictions in its definition of "employer" and "employee," *see* 820 ILCS 40/1, this demonstrates, at best, ambiguity rather than clear intent. Moreover, the venue provision cited by Defendants provides further support for IPPRA's lack of extraterritorial reach. That provision allows an IPPRA claimant to bring his or her claim in the "circuit court for the county in which the complainant resides, in which the complainant is employed, or in which the personnel record is maintained."

14

820 ILCS 40/12(c). Two of the three possible venues are defined by reference to the employee, rather than the employer. Furthermore, if the statute were construed to provide a cause of action to employees who live and work out of state, the venue provision would create the anomalous situation where an out-of-state employee would have no venue at all when his records are also maintained outside of Illinois. This reinforces the Court's view that IPPRA does not supply a claim to plaintiffs like Belcastro. Thus, the IPPRA claim is dismissed for failure to state a claim.

### C. Count IV: Defamation

Defendants next argue that Belcastro's defamation claim should be dismissed because his allegations are too conclusory. To state a claim for defamation, "the plaintiff must set out sufficient facts to show that the defendants made a false statement concerning him, that there was an unprivileged publication to a third party with fault by the defendant, which caused damage to the plaintiff." *Krasinski v. United Parcel Serv., Inc.*, 530 N.E.2d 468, 471 (Ill. 1988). "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him. A statement is defamatory *per se* if its harm is obvious or apparent on its face." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). Of the five categories of statements that are considered defamatory *per se*, the ones relevant here are "words that impute a person lacks ability or otherwise prejudices that person in his or her profession" and "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties." *Id.* To prove publication, a plaintiff must show that "the defamatory statements were communicated to some person other than plaintiff." *Pandya v. Hoerchler*, 628 N.E.2d 1040, 1043 (Ill. App. Ct. 1993).

Belcastro alleges that United incorrectly coded his resignation as a termination and then published the purported termination to third parties. According to Belcastro, this publication

15

harmed his character and is "bound to have serious negative effect on Belcastro's occupation and profession as a pilot." (Compl. ¶ 29, Dkt. No. 1.) Those allegations in the complaint are stated without any context or detail—no information is provided as to when, how, or to whom the allegedly defamatory statement was published. Further, Belcastro provides no information as to what exactly the defamatory statement was. Did United simply use a coding system to signify that Belcastro was terminated or was there some more detailed explanation? Was Belcastro's name used in the posting? With no factual allegations about the act of publication and limited allegations regarding the defamatory statement itself the Court is unable to determine whether the alleged statement constitutes defamation *per se*. A plaintiff must provide more than "abstract recitations of the elements of a cause of action or conclusory legal statements." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). As currently pleaded, Belcastro's allegations do not provide fair notice to Defendants of the grounds upon which his claim for relief rests. Consequently, the Court dismisses Count IV.

### D. Count V: Tortious Interference with Employment

Defendants also move to dismiss Belcastro's tortious interference claim against Simons. In Illinois, to establish a claim for tortious interference with a business relationship, Belcastro must prove: (1) a reasonable expectation of entering into a valid business relationship; (2) that Simons had knowledge of this expectation; (3) intentional interference by Simons that prevents Belcastro's legitimate expectation from ripening into a valid business relationship; and (4) damages resulting from the interference. *See Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & W. Ry. Co.*, 748 N.E.2d 153, 161 (Ill. 2001). Claims for tortious interference with employment usually "lie against third-parties who cause the employer/employee relationship to terminate and not against the employer or agent who terminates the employee." *Otterbacher v. Nw. Univ.*, 838

16

F. Supp. 1256, 1260–61 (N.D. Ill. 1993) (holding that allegations that plaintiff's supervisor gave unrealistic and unreasonable demands on the job did not state a claim for tortious interference with employment). Therefore, if a supervisor terminates an employee, "it cannot be said that the supervisor has caused a third party to terminate the employment relationship." *Peterson v. Advanced Tech. Labs., Inc.*, No. 93-cv-01801, 1995 WL 330881, at *8 (N.D. Ill. May 30, 1995). A supervisor may only be held liable for tortious interference with employment if a third-party was the final decision-maker, this third-party relied on false information provided by the supervisor, and the supervisor acted "solely for his or her personal interest, and totally unrelated to or antagonistic to the interest of the employer, in order to effectuate a wrongful termination of a subordinate." *Otterbacher*, 838 F. Supp. at 1261.

Belcastro alleges that Simons's termination decision interfered with Belcastro's reasonable expectation of continued employment with United. Simons is an employee and agent of United. Thus, Belcastro cannot hold Simons liable for tortious interference based on the facts alleged. Belcastro has not alleged that Simons induced a third party to wrongfully terminate his employment. Instead, according to Belcastro, Simons himself forced Belcastro to resign. Therefore, the motion to dismiss Count V is granted as well.

## CONCLUSION

For the foregoing reasons, Defendants United Airlines, Inc. and James Simons's motion to transfer (Dkt. No. 13) is denied and their partial motion to dismiss (Dkt. No. 16) is granted. Specifically, Count II is dismissed with prejudice, while Counts III, IV, and V are dismissed without prejudice. Belcastro shall have 21 days from the entry of this Order to file an amended complaint remedying the issues identified herein.

ENTERED:

Dated: April 19, 2018

_____
Andrea R. Wood
United States District Judge