**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER N. BELCASTRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-01682 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| UNITED AIRLINES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Christopher Belcastro was in his first year as a pilot for Defendant United Airlines, Inc. ("United"), when a series of unplanned absences led to him being forced to resign or else face immediate dismissal. Belcastro, however, contends that the true reason for his forced resignation is because his Black supervisor, Defendant James Simons, was biased against him because he was white. For that reason, Belcastro has brought the present action against Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and Illinois state law. Now, Defendants move for summary judgment as to all Belcastro's claims. (Dkt. No. 223.) For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

### I.    Local Rule 56.1

Before summarizing the material facts, the Court first addresses a dispute between the parties regarding Belcastro's purported noncompliance with the Northern District of Illinois's Local Rule 56.1. In particular, Defendants have requested that the Court strike certain of Belcastro's responses to Defendants' statement of material facts in support of summary judgment and nearly all the factual assertions in Belcastro's statement of additional facts in opposition to

Defendants' motion for summary judgment. Further, Defendants request that the Court strike a declaration from Belcastro cited as evidentiary support for certain factual assertions in his statement of additional facts. Belcastro, in turn, argues that all Defendants' objections are meritless[1] and for that reason has filed a motion to deem as admitted the factual assertions in his statement of additional facts. (Dkt. No. 256.)

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts that it contends entitle it to summary judgment. L.R. 56.1(a)(2), 56.1(d). The statement of facts "must consist of concise numbered paragraphs" and "[e]ach asserted fact must be supported by citation to specific evidentiary material . . . that supports it." L.R. 56.1(d)(1), (2). The party opposing summary judgment must then file a response to the movant's statement. L.R. 56.1(b)(2). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert that fact. L.R. 56.1(e). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

To the extent the opposing party wishes to present any additional facts, it may do so by submitting a separate statement of additional facts that complies with Local Rule 56.1(d), which governs the moving party's statement of material facts. L.R. 56.1(b)(3). Then, the moving party must submit a response to those additional facts subject to the requirements for the opposing party's response to the statement of material facts set forth in Local Rule 56.1(e). L.R. 56.1(c)(2). No submission under Local Rule 56.1 may contain legal argument, except responses may raise

---

[1] Belcastro moved for leave to file a sur-reply to oppose Defendants' requests to strike and attached his proposed sur-reply as an exhibit to his motion. (Dkt. No. 255.) Because the Court has considered the arguments in Belcastro's proposed sur-reply, that motion is granted.

objections, "including objections based on admissibility, materiality, or absence of evidentiary support." L.R. 56.1(d)(4), (e)(2). But "[i]n the event an objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver." L.R. 56.1(e)(2).

Local Rule 56.1(e)(2) expressly states that motions to strike all or a portion of a party's Local Rule 56.1 submission are "disfavored." Courts in this District have further explained that striking those submissions is "particularly unnecessary, because the court must always review statements of material facts and eliminate from consideration any argument, conclusions, and assertions that are unsupported by the record." *Compton v. DuPage Cnty. Health Dep't*, 426 F. Supp. 3d 539, 545 (N.D. Ill. 2019) (internal quotation marks omitted). Indeed, "Local Rule 56.1 includes its own enforcement provisions, making motions to strike Local Rule 56.1 statements or responses superfluous at best." *Parker v. Four Seasons Hotels, Ltd.*, No. 12 C 3207, 2014 WL 1292858, at *1 (N.D. Ill. Mar. 31, 2014) (internal quotation marks omitted). Thus, courts in this District generally grant motions to strike only where it will "expedite the Court's work." *Oxford Bank & Tr. v. Village of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012).

According to Defendants, many of the denials in Belcastro's response to Defendants' statement of facts should be stricken because they are evasive, discuss immaterial matters, fail to cite evidence that directly refutes Defendants' facts, or make unnecessary legal arguments. Defendants further argue that almost all the factual assertions in Belcastro's statement of additional facts should be stricken because they are not concise, are immaterial, or lack sufficient evidentiary support. However, the Court does not believe that striking portions of Belcastro's Local Rule 56.1 submissions will substantially expedite the Court's work. Instead, the Court will consider each of Defendants' objections on an individual basis and disregard any of Belcastro's facts that are immaterial, inadmissible, or unsupported by the record. *See, e.g.*, *Oxford Bank &*

*Tr.*, 879 F. Supp. 2d at 960 ("The Court is capable of disregarding statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, or contain unfounded, irrelevant, or unsupported assertions of fact.").

Nonetheless, the Court next briefly explains two determinations that significantly color its view of the facts. The first concerns Belcastro's declaration that he cites as evidence to support many of the factual assertions in his statement of additional facts. (Belcastro's Statement of Additional Facts, Ex. 3, Dkt. No. 234-3.) Although the Court declines to strike the declaration in its entirety, Defendants correctly note that Belcastro's declaration was created after the close of fact discovery and certain statements in it contradict his own prior sworn testimony. While the Seventh Circuit generally allows "unsubstantiated, self-serving affidavits [to] be used to defeat a motion for summary judgment," it does "not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony." *United States v. Funds in the Amount of $100,120*, 730 F.3d 711, 718 (7th Cir. 2013). Thus, the Court disregards any of Belcastro's factual assertions that are supported only by statements in his declaration and are inconsistent with his prior statements made under oath. Second, when the Court disagrees with Defendants' underlying objections to Belcastro's additional facts, it will deem the corresponding factual assertion admitted. This is consistent with Local Rule 56.1(e)(2)'s procedure. Moreover, Defendants stated in open court their position that even if all Belcastro's factual assertions are deemed admitted, those assertions would not defeat summary judgment. The Court will therefore resolve any doubts concerning Defendants' objections in favor of deeming Belcastro's additional facts as admitted.[2]

---

[2] Because the Court has determined that the best course is to evaluate Defendants' objections individually and employ the procedures of Local Rule 56.1 as necessary, the Court denies as moot Belcastro's motion to deem admitted the entirety of his statement of additional facts.

## II.     Factual Background

Subject to the above considerations, the facts summarized below are undisputed unless otherwise noted.

Belcastro is a white man who was hired by United on April 7, 2015 to work as a pilot. (Pl.'s Resp. to Defs.' Statement of Material Facts ("PRDSF") ¶¶ 1, 4, Dkt. No. 233; Defs.' Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 1, Dkt. No. 252.) Throughout the entirety of his tenure at United, Belcastro was considered a probationary pilot. (PRDSF ¶ 4; DRPSAF ¶ 1.) Under the United Pilot Agreement ("UPA"), the collective bargaining agreement entered into between United and the Air Line Pilots Association ("Union"), all newly hired United pilots spend the first 12 months following their hiring as probationary pilots. (PRDSF ¶ 9.) Unlike non-probationary pilots, probationary pilots are employed on an at-will basis and are subject to discipline or dismissal at the discretion of their supervising Chief Pilot. (*Id.* ¶¶ 10, 12.) Many senior leaders at United refer to a pilot's probationary period as essentially a "year-long interview process." (*Id.* ¶ 11.) Once a pilot has moved past his probationary period, any disciplinary measures imposed upon him must comply with United's progressive disciplinary process and other related policies. (*Id.* ¶¶ 10, 12.)

Following six weeks of training, Belcastro was assigned a domicile at Dulles International Airport ("Dulles"), located outside of Washington, D.C. (PRDSF ¶ 5; DRPSAF ¶ 3.) Because Belcastro's residence was near Cleveland, Ohio, he had to commute to his domicile. (PRDSF ¶ 5; DRPSAF ¶ 4.) Belcastro's direct supervisor was James Simons, the Chief Pilot for Dulles, and a Black man. (PRDSF ¶¶ 1, 5; DRPSAF ¶ 3.) As Dulles's Chief Pilot, Simons was responsible for supervising and disciplining pilots domiciled at Dulles. (PRDSF ¶ 6.) Simons was supported by

the Chief Pilot's Office personnel, who monitored probationary pilots for possible disciplinary issues and escalated those issues to Simons when necessary (*Id.*)

The first eight months of Belcastro's employment at United were relatively uneventful, and he had no significant disciplinary issues. (DRPSAF ¶¶ 7–8.) But on December 15, 2015, for the first time while at United, Belcastro had to miss a flight due to sickness. (*Id.* ¶ 8.) Under Federal Aviation Administration regulations, a pilot is not permitted to work when he is sick and United accordingly requires pilots who are sick to call in their absence and not show up to work. (*Id.* ¶¶ 8–9, 14.) His absence was labeled as "CCS Sick Call" in United's system, indicating that the pilot notified United's crew scheduling of his sickness through the electronic Crew Communications System rather than by telephone. (PRDSF ¶¶ 17, 19; DRPSAF ¶ 8.)

Just ten days later, on December 25, 2015, Belcastro had a second absence that was labeled "Missed Trip." (PRDSF ¶ 20; DRPSAF ¶ 11.) On that day, Belcastro was assigned to work a flight departing from Dulles. (PRDSF ¶ 20; DRPSAF ¶ 10.) Being a commuter pilot, Belcastro had to take a flight from Cleveland to Dulles to report for his assigned flight. (*Id.*) United's policy for commuter pilots requires them to "exercise prudent judgment" to ensure that they arrive to their assigned flight on time. (PRDSF ¶ 18.) At minimum, a commuter pilot is expected to reserve both a primary flight and a secondary flight to the location of his assignment, and both flights should be scheduled to arrive in time for the commuter pilot to report for his assignment. (PRDSF ¶ 18; DRPSAF ¶ 10.) Accordingly, Belcastro scheduled two flights from Cleveland to Dulles, both of which were scheduled to depart on December 25 at roughly the same time. (DRPSAF ¶ 11.) While Belcastro was able to board his primary flight, it was held on the ground for two hours due to inclement weather in the Washington, D.C. area and ultimately cancelled. (*Id.*) By the time Belcastro's plane returned to its gate, his secondary flight had

departed, leaving him unable to make it to Dulles in time for his assigned flight. (*Id.*) Because Belcastro's Missed Trip occurred on Christmas, United regarded his absence as particularly egregious. (PRDSF ¶ 21.) According to Belcastro, United incorrectly believed that his Missed Trip was caused by his failure to schedule a secondary flight when, in fact, he did have a secondary flight that he missed due to the issues with his primary flight. (DRPSAF ¶¶ 11–12.)

Belcastro's next absence occurred on February 15, 2016. (PRDSF ¶ 22; DRPSAF ¶ 13.) At the time, Belcastro was on reserve duty—meaning that he had no established schedule but was required to be available to receive an assignment at any time. (PRDSF ¶ 27; DRPSAF ¶ 13.) On February 15, Belcastro began feeling ill and attempted to call and notify crew scheduling that he would be unable to fly. (DRPSAF ¶ 13.) But before he could place a call to crew scheduling, crew scheduling called him with a flight assignment. (*Id.*) Belcastro informed crew scheduling that he could not accept the assignment because he was sick. (*Id.*) United labeled Belcastro's absence as a "Sick at Assignment" occurrence in its system, which refers to instances where a reserve pilot gives notice of his sick leave in response to a crew scheduler attempting to assign him a trip. (PRDSF ¶¶ 15, 22.) According to United, Sick at Assignment occurrences are rare. (*Id.* ¶ 23.) When the Dulles Chief Pilot's Office's Flight Manager, Jonathan Sawyer, spoke with Belcastro about the Sick at Assignment, Belcastro explained that he had been attempting to call crew scheduling to report that he had the flu at the same time crew scheduling was attempting to reach him. (*Id.* ¶ 24.) Due to his illness, Belcastro took authorized sick leave through February 17, 2016. (DRPSAF ¶ 15.) His leave led to a "Sick Leave" entry in United's system for February 17, 2016. (PRDSF ¶ 25; DRPSAF ¶ 15.) A Sick Leave occurrence refers simply to "[l]eave taken as a result of personal illness, injury, or family emergency." (PRDSF ¶ 15.)

Finally, on March 3, 2016, Belcastro had an occurrence United labeled as "Unable to Contact" ("UTC") on what was scheduled to be his first day of a reserve-duty period. (PRDSF ¶¶ 26–27; DRPSAF ¶ 17.) The night before, Belcastro returned home from a vacation and began attending to various personal matters in advance of the beginning of his reserve period at 12:00 a.m. (DRPSAF ¶ 17.) Sometime after 6:00 p.m., United's crew scheduling made two calls to Belcastro to confirm his availability for a reserve flight assignment the next day and left two corresponding voicemails when he did not pick up. (PRDSF ¶ 27; DRPSAF ¶ 19.) At the time, Belcastro believed that his obligation to respond to crew scheduling's calls was governed by guidelines provided to him by the Union representing its interpretation of the UPA's requirements for pilots on the day prior to the commencement of their reserve duty. (DRPSAF ¶ 18.) The Union stated that a pilot was required to be telephonically available beginning at 12:01 a.m. on his first day of reserve duty. (*Id.*) However, a pilot may receive an assignment for his first reserve-day on the day before his reserve duty begins. (*Id.*) While the pilot is not required to answer his phone on his day off, if the assignment is entered before 6:00 p.m., the pilot is required to acknowledge the assignment between 8:00 p.m. and 12:00 a.m. that day, either by phone or electronically. (*Id.*)

Belcastro received the two voicemails from crew scheduling before 12:00 a.m. (*Id.* ¶ 19.) Based on his understanding of the Union's guidelines, Belcastro did not immediately respond to the voicemails because his assignment was entered after 6:00 p.m. (*Id.*) Instead, Belcastro continued with his personal tasks and turned on his phone at 12:00 a.m., with the expectation of receiving a third phone call from crew scheduling regarding his assignment. (PRDSF ¶ 27; DRPSAF ¶¶ 19–20.) His expectation was informed by both the Union's interpretation of the UPA as well as his past experience of receiving a third phone call from crew scheduling shortly after midnight. (PRDSF ¶¶ 27–28; *see also* Defs.' Statement of Material Facts, Ex. 1, Belcastro Dep.

Tr. at 87:7–24, Dkt. No. 226-1.) Thus, Belcastro was ready to receive a third call beginning at 12:00 a.m. on March 3, 2016, but he did not receive a third call from crew scheduling. (DRPSAF ¶ 20.) Nonetheless, the morning of March 3, Belcastro went to the Cleveland airport to commute to Dulles for his assignment. (*Id.* ¶ 21.) Upon arriving at the Cleveland airport, Belcastro saw that United had recorded him as UTC for that day's assignment. (*Id.*)

Later that day, Sawyer spoke with Belcastro about the UTC. (PRDSF ¶ 29; DRPSAF ¶ 22.) Belcastro explained to Sawyer that he believed that his conduct was consistent with the Union's interpretation of the UPA. (DRPSAF ¶ 22.) Subsequently, Belcastro reached out to a Union representative seeking assistance in challenging the UTC. (*Id.* ¶ 23.) The Union's local chairman affirmed that pilots were not required to call crew scheduling on their last day off prior to a reserve assignment and was able to get the UTC removed from Belcastro's record. (PRDSF ¶ 31; DRPSAF ¶ 23.) When Simons learned that the UTC had been removed, he had Sawyer contact United's Managing Director of Contract Administration, Paul Carlson, to obtain his opinion on the propriety of the UTC. (PRDSF ¶ 32; DRPSAF ¶ 24.) Carlson concluded that the Union's understanding of a pilot's responsibility to acknowledge reserve assignments was incorrect and agreed with the Dulles Chief Pilot's Office's position that the UTC was appropriate. (PRDSF ¶ 33.) Given the consensus opinion among Carlson and the Dulles Chief Pilot's Office, Belcastro's UTC was reinstated. (*Id.* ¶ 34.)

Following the UTC incident, Simons decided to speak with Belcastro regarding his recent spate of absences. (*Id.* ¶ 35.) For Simons, Belcastro's attendance issues raised concern regarding his dependability, which was an important consideration in Simons's evaluation of probationary pilots. (*Id.* ¶¶ 13, 35, 39.) As Belcastro understood it, dependability was a critical trait for commercial airline pilots. (*Id.* ¶ 14.) And United considered missed trips due to sickness or

otherwise as a potential dependability issue. (*Id.* ¶ 16.) Specifically, missed trips negatively impact United's operations because they threaten to disrupt on-time departures and arrivals and place an extra burden on crew schedulers and other pilots to replace the absent pilot. (*Id.*)

Belcastro subsequently received an "Order to Appear" letter, requesting that he attend a meeting with Simons at the Dulles Chief Pilot's Office on March 17, 2016. (PRDSF ¶ 36; DRPSAF ¶ 26.) Before the meeting, Simons made inquiries regarding the process for dismissing a probationary pilot, explaining that he believed that Belcastro would be a "nightmare" to work with due to his "attitude, reliability[,] and playing games with the UPA." (PRDSF ¶ 37; DRPSAF ¶ 27.) On March 17, 2016, Belcastro met with Simons as well as a United Human Resources employee and a Union representative. (PRDSF ¶ 38; DRPSAF ¶ 28.) During the meeting, Simons expressed his concern regarding Belcastro's record of absences, explaining that a pilot's probationary year is his opportunity to demonstrate that he is a fit for United and would work for the good of the company. (PRDSF ¶ 39.) Belcastro told Simons that he was "embarrassed" by his record and admitted that he had a practice of waiting for crew scheduling to call him three times before confirming a reserve flight assignment. (*Id.* ¶ 40.) He promised that he would be more proactive in the future. (PRDSF ¶ 40; DRPSAF ¶ 28.) At the meeting's conclusion, Simons stated that Belcastro would receive a "letter of counsel" (a non-disciplinary record of a conversation) and left open the possibility of additional punishment. (PRDSF ¶ 41; DRPSAF ¶ 28.)

Simons later recalled leaving the meeting with a negative impression of Belcastro due to his admission that he made crew schedulers call him three times, believing that such a practice unnecessarily made their jobs more difficult. (PRDSF ¶ 42.) Ultimately, Simons concluded that Belcastro should not be a United pilot. (*Id.* ¶ 46.) Simons did not arrive at that conclusion lightly and fully considered that Belcastro had received positive evaluations in the Probationary Pilot

Reports prepared by the experienced pilots with which he worked. (*Id.*) Nonetheless, Simons believed that the dependability and attitude issues Belcastro exhibited during his probationary year warranted separation. (*Id.*) Specifically, Simons determined that Belcastro's record of absences and his conduct of forcing crew schedulers to do extra work fell short of United's high expectations for its pilots. (*Id.* ¶ 47.) Indeed, no other pilot under Simons's supervision had a comparable record of dependability and attitude issues. (*Id.* ¶ 49.) Although Simons was solely responsible for deciding Belcastro's future with United, he nonetheless consulted with several members of United's senior leadership and found unanimous support for his conclusion. (*Id.* ¶¶ 44–45.) In voicing support for the decision, United's Systems Chief Pilot told Simons that Belcastro's admission that he made crew scheduling call him three times was "egregious" and "mind boggling" for a probationary pilot. (*Id.* ¶ 45.)

Instead of terminating Belcastro, Simons decided to treat him "as humanely as possible" by privately offering him the opportunity to resign. (*Id.* ¶ 50.) In the event that Belcastro rejected Simons's offer to resign, Simons had United's Human Resources draft a letter notifying Belcastro that he was being separated from his employment with United. (PRDSF ¶ 51.) Simons then ordered Belcastro to meet with him on March 25, 2016, at the Chief Pilot's Office in Cleveland. (PRDSF ¶ 52; DRPSAF ¶ 32.) When Belcastro arrived for the meeting, Simons invited Belcastro to meet with him in private. (DRPSAF ¶ 32.)

Once they were alone, Belcastro claims that he had the following interaction with Simons. First, Simons informed Belcastro that he had five minutes to sign a letter of resignation or else be dismissed effective immediately. (PRDSF ¶ 52; DRPSAF ¶¶ 33–34.) At some point during the meeting, Simons told Belcastro that he was not qualified to be a United pilot and should never have been hired to begin with. (PRDSF ¶ 54.) Simons continued that "there are plenty of other

11

pilots out there who are more qualified that should have been hired at United," specifically mentioning "his black friend who flies for Air Force One" as someone who should be hired by United. (PRDSF ¶ 54; DRPSAF ¶ 33.) Further, Simons stated that he did not know why "people like you" (referring to Belcastro) got hired by United but his friend could not. (*Id.*) The meeting ended with Belcastro signing a letter of resignation to avoid being fired. (PRDSF ¶ 52; DRPSAF ¶ 34.) Belcastro's employment with United ended with only a few weeks remaining on his probationary period. (DRPSAF ¶ 7.)

Belcastro made several unsuccessful attempts at regaining his employment with United. (PRDSF ¶¶ 57, 59.) One effort involved filing a grievance with the Union regarding the March 3 UTC. (DRPSAF ¶ 25.) That grievance was eventually settled on December 16, 2016, and United agreed to compensate Belcastro for the $321.36 he would have been paid had the UTC not been assessed. (*Id.*) In settling, United made no admission of liability and maintained that it did not violate the UPA in issuing the UTC. (PRDSF ¶ 62; DRPSAF ¶ 25.)

Since his resignation, Belcastro has encountered substantial difficulties finding new employment as a commercial airline pilot. (DRPSAF ¶ 38.) He has applied to dozens of airlines without success, even though many positions were entry-level positions that offered a fraction of the pay he received at United. (*Id.*) Exacerbating his struggles in finding new employment is the fact that certain airline-industry employees have viewed a screenshot of Belcastro's United "master schedule" containing an entry with the word "termination," which was purportedly published on an internet forum catering to the airline industry. (PRDSF ¶¶ 64–65.) Thus, even though United allowed Belcastro to resign so as to make his separation appear voluntary, the publication of the screenshot led many in the airline community to conclude that he had been fired due to his poor work ethic. (*Id.* ¶¶ 68, 77, 79.)

**DISCUSSION**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Belcastro asserts a Title VII claim against United, claiming that he was unlawfully discriminated against on the basis of his race (white) when he was forced to resign from his employment at United. In addition, he brings Illinois state-law claims for defamation against United and Simons and for tortious interference with employment against Simons. Defendants move for summary judgment on all three claims.

**I.    Title VII**

In assessing Title VII claims, this Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court considers the evidence as a whole, "rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

As an initial matter, the Court addresses Defendants' assertion that Belcastro has invited the Court to commit reversible error by analyzing the evidence under separate methods. Specifically, Belcastro attempts to demonstrate a genuine dispute of material fact by employing two different methods of proof that he labels as the "direct" method and "indirect" method. Essentially, the distinction between these two "methods" involves whether or not a plaintiff seeks to prove his claim via the burden-shifting framework set out in *McDonnell Douglas Corp. v.*

13

*Green*, 411 U.S. 792 (1973), which is sometimes referred to as the "indirect" method. The Seventh Circuit has been critical of the "direct" versus "indirect" terminology, insofar as it led courts improperly to sort evidence into "different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Ortiz*, 834 F.3d at 766. Nonetheless, the Seventh Circuit continues to recognize the *McDonnell Douglas* framework as "one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action" based on a proscribed factor. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (internal quotation marks omitted).

This Court does not view Belcastro's arguments in opposition to summary judgment as reliant on any impermissible evidence sorting. The Court may employ alternative methods to analyze the evidence so long as the evidence ultimately is placed in "a single pile" and "evaluated as a whole," *Ortiz*, 834 F.3d at 766, and the Court's sole focus is on whether Belcastro "has produced sufficient evidence to support a jury verdict of intentional discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Indeed, recent Seventh Circuit Title VII decisions have employed alternative methodical approaches, analyzing the evidence under both the *McDonnell Douglas* framework while also viewing it through the lens of *Ortiz*, which eschews any framework and simply asks whether the totality of the evidence shows discrimination. *E.g.*, *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–59 (7th Cir. 2021); *McDaniel*, 940 F.3d at 367–70. Thus, here, the Court will begin by employing the *McDonnell Douglas* framework and then will consider the evidence under *Ortiz*'s holistic approach.

### A.    *McDonnell Douglas*

Under the *McDonnell Douglas* framework, a plaintiff may establish a prima facie case of discrimination with evidence demonstrating that: (1) he is a member of a protected class; (2) he was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *McDaniel*, 940 F.3d at 368. If the plaintiff satisfies all four elements of his prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal quotation marks omitted).

Because Belcastro is a white man alleging racial discrimination, the protected-class element of the *McDonnell Douglas* framework is modified such that Belcastro must produce evidence of "background circumstances" demonstrating that his "employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021). "[T]his prong can be satisfied by evidence that members of one race were fired and replaced by members of another race." *Id.* In addition, "evidence that employers are under pressure from affirmative action plans, customers, public opinion, the [Equal Employment Opportunity Commission], a judicial decree, or corporate superiors imbued with belief in 'diversity' may similarly satisfy this prong. *Id.* (internal quotation marks omitted).

In their briefs, neither side recognizes the reverse-racial-discrimination modification to *McDonnell Douglas*. But as Belcastro's main piece of evidence demonstrating racial discrimination is Simons's remark wondering why United hired people like Belcastro when

United could have hired numerous other pilots such as Simons's Black friend who flies for Air Force One, the Court infers that Belcastro would posit this comment as evidence of United's inclination to discriminate or that otherwise suggests something "fishy" about his discharge.[3]

Defendants dismiss Simons's purported comment as simply a "stray remark" that cannot support an inference that Simons acted with racial animus. "[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (internal quotation marks omitted). However, "[t]he 'stray remarks' rationale can be applied only to remarks that are not part of the decision-making process itself." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 934 (7th Cir. 2020). Where, as here, the remark comes from the decisionmaker and was made during the decisionmaking process, the remark is probative evidence of unlawful discrimination. *Id.* at 934–35. As will be discussed further below, Simons's remark does not unmistakably reveal an illegal motivation behind his decision to request Belcastro's resignation. Nonetheless, viewed in the light most favorable to Belcastro, the fact that Simons, a Black man and the decisionmaker here, stated in the course of separating Belcastro from his employment that his Black friend should have been hired by United and that Belcastro, a white man, should not have been hired tends to raise a suspicion of unlawful discrimination. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009) (noting that the decisionmakers' "discriminatory comments might be sufficient to establish the requisite background circumstances"); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) (identifying a decisionmaker's expression of "intense interest" in hiring a member of a protected

---

[3] Defendants assert that Simons does not have any friends who served as pilots on Air Force One. (PRDSF ¶ 56.) The implication of that assertion is that Simons never made the racial remark. However, since Belcastro is the non-moving party, the Court must view the facts in the light most favorable to him and therefore accepts for present purposes that Simons made the remark.

class as a background circumstance supporting an inference of discrimination). It is at least enough for the Court to proceed to consider the next element of Belcastro's prima facie case.

The next element of Belcastro's prima facie case requires him to prove that he was meeting United's legitimate expectations. In considering this element, the Court "looks to whether [the employee] was performing adequately at the time of the adverse employment action." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). Here, Belcastro emphasizes evidence showing a general consensus at United that he was a skilled pilot with a solid flight record. (DRPSAF ¶¶ 3, 5–6.)[4] However, Defendants do not claim that Belcastro fell short of United's expectations once he entered the cockpit. Rather, United's issue with Belcastro concerned his conduct ***outside*** of the cockpit—United did not believe that it could rely on Belcastro to report to his assigned flights on schedule. There is no dispute that United considered dependability to be a critical trait for its pilots and that Simons considered dependability in evaluating probationary pilots. (PRDSF ¶¶ 13–14, 16.) Certainly, it was legitimate for United to expect pilots to have a strong attendance record, as pilot absences threaten United's operations and cause additional burdens for other United employees. (*Id.* ¶ 16.) Yet in the four months preceding his discharge, Belcastro missed five different flight assignments. (*Id.* ¶¶ 19–22, 25–26.) Moreover, for three of those absences, Belcastro failed to give proper advance notice of his absence. (*Id.* ¶¶ 20–23, 26–30.) And one absence occurred on Christmas, when an unplanned pilot absence can be particularly disruptive to United's operations. (*Id.* ¶ 21.)

---

[4] To show that he was meeting United's legitimate expectations, Belcastro relies in significant part on probationary pilot reviews prepared by the more experienced pilots with which he flew. However, the Seventh Circuit has explained that "general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 752 (7th Cir. 2006).

Compounding United's concerns with Belcastro's attendance record was his attitude. In particular, Simons found it galling that, in explaining the circumstances of his UTC, Belcastro acknowledged receiving two voicemails from crew scheduling but waited for a third call instead of calling them back. (*Id.* ¶ 47.) Others at United similarly felt that Belcastro's conduct in having crew scheduling call him three times was "egregious" and "mind boggling," especially since Belcastro was a probationary pilot. (*Id.* ¶ 45.) Given that United treated a pilot's probationary period as essentially a one-year-long interview giving the pilot the opportunity to demonstrate his fit with the company (*id.* ¶¶ 11, 39), United reasonably expected Belcastro to show greater initiative in responding to assignments. As one of Simons's colleagues explained: "There are 12,000 pilots out there who want to work [at United] who won't make the crew desk call 3 [times] before they answer." (Defs.' Statement of Material Facts, Ex. 7, Ellis Dep. Ex. 14, Dkt. No. 226-7.) Belcastro defended himself by claiming that his conduct resulting in the UTC was in technical compliance with the UPA, but that defense only convinced Simons that Belcastro was "playing games with the UPA." (PRDSF ¶ 37; DRPSAF ¶¶ 22–23, 25, 28.) And Belcastro himself acknowledged that he could have been more proactive in responding to crew scheduling and had fallen short of United's expectations. (PRDSF ¶ 40; DRPSAF ¶ 28.)

Having failed to demonstrate that he was meeting United's legitimate expectations, Belcastro cannot establish a prima facie case of discrimination under *McDonnell Douglas*. Nonetheless, the Court will proceed with the remainder of the *McDonnell Douglas* analysis, as it will inform the Court's holistic evaluation of the evidence under *Ortiz*. There is no dispute that Belcastro suffered an adverse employment action, as his choice between resigning and immediate dismissal constituted a constructive discharge. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011) ("There is no dispute that [the plaintiff's] forced resignation

constitutes an adverse employment action . . . ."); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409

(7th Cir. 2008) ("[W]hen an employer acts in a manner so as to have communicated to a

reasonable employee that she will be terminated, and the plaintiff employee resigns, the

employer's conduct may amount to constructive discharge." (internal quotation marks omitted)).

The last element of Belcastro's prima facie case requires him to present evidence that United

treated similarly situated non-white individuals more favorably.

Title VII's recognizes that, "[a]ll things being equal, if an employer takes an action against

one employee in a protected class but not another outside that class, one can infer discrimination.

The 'similarly situated' prong establishes whether all things are in fact equal." *Coleman v.

Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). For an employee

to be similarly situated, the employee "must be directly comparable to the plaintiff in all material

respects, but they need not be identical in every conceivable way." *Id.* (internal quotation marks

omitted). "The purpose of the 'similarly-situated' comparator is to ensure that all other variables

are discounted so that discrimination can be inferred." *Arizanovska v. Wal-Mart Stores, Inc.*, 682

F.3d 698, 703 (7th Cir. 2012). Where "a plaintiff claims that he was disciplined by his employer

more harshly than a similarly situated employee based on some prohibited reason[,] a plaintiff

must show that he is similarly situated with respect to performance, qualifications, and conduct."

*Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir.

2007) (internal quotation marks omitted.).

Here, Belcastro presents evidence of nine other probationary pilots under Simons's

supervision who received a UTC between 2015 and 2016 but were not discharged. (DRPSAF

¶ 37.) However, nine of those probationary pilots were white and therefore are not proper

comparators for the similarly situated inquiry. *See Arizanovska*, 682 F.3d at 703 ("The 'similarly-

situated' inquiry is a flexible, common-sense one, but it at least requires that the plaintiff name a comparator outside her protected class." (internal quotation marks and citation omitted)). But one comparator was Black, a probationary pilot, and under Simons's supervision, and therefore could potentially be a proper comparator if he "engaged in comparable rule or policy violations and received more lenient discipline." *Coleman*, 667 F.3d at 850 (internal quotation marks omitted). However, Belcastro fails to demonstrate that his proposed comparator engaged in similar misconduct. As discussed above, Belcastro's record of misconduct did not consist of a single UTC but also four other absences and attitude issues. And, as Belcastro concedes, it was the entirety of his record that led to his discharge rather than the UTC alone. (PRDSF ¶¶ 49, 63; Defs.' Statement of Material Facts, Ex. 3, Simons Dep. Tr. at 65:14–19, Dkt. No. 226-3 ("In this particular case the reason that Mr. Belcastro came to my attention, it wasn't just because of a UTC, it was because of a record that he had over a period of time that basically laid out that he was not dependable."). Thus, the proposed comparator cannot be deemed similarly situated to Belcastro based solely on the fact that both had UTCs, since Belcastro's attendance issues were more extensive. *See Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549–50 (7th Cir. 2017) (finding that a comparator with a single verbal warning for missing work was not similarly situated to the plaintiff, who had repeatedly violated the employer's attendance policy); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ("[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." (internal quotation marks omitted)).

If Belcastro could establish his prima facie case, Defendants would be able to point to Belcastro's attendance record and attitude as legitimate, nondiscriminatory reasons for his termination. The burden would then shift back to Belcastro to set forth evidence showing that

those reasons were pretext for discrimination. "Pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (internal quotation marks omitted). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman*, 667 F.3d at 852 (internal quotation marks omitted). To show pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [employer's] asserted reason that a reasonable person could find it unworthy of credence." *Id.* (internal quotation marks omitted).

Belcastro contends that Simons could not have honestly doubted Belcastro's reliability because there were mitigating circumstances surrounding each of his absences: for the three absences when he was sick, Belcastro was prohibited from working by federal law and United policy; on Christmas, he had properly booked both a primary and secondary flight but the primary flight was grounded and then cancelled, causing him to miss the secondary flight; and Belcastro's conduct resulting in the UTC was consistent with the Union's interpretation of the UPA. But those explanations do nothing to support a claim of pretext because Belcastro "must do more than dispute the validity of [his] employer's criticisms." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). This Court's role is not to determine whether Belcastro was treated unfairly or too harshly by United. A court does not "act as a super personnel department that second-guesses employers' business judgments." *Millbrook*, 280 F.3d at 1181 (internal quotation marks omitted); *see also Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d at 765 ("[I]t is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers.").

Pretext can often be inferred from shifting or inconsistent explanations for the challenged employment decision. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). But here, the evidence shows that Simons consistently cited concerns about Belcastro's reliability and attitude as necessitating his discharge. Sometime before Simons first met with Belcastro on March 17, he sent three emails to others at United inquiring about the process for terminating a probationary pilot, explaining that Belcastro's "attitude, reliability and playing games with the UPA" would make him a "nightmare" to work with long-term. (PRDSF ¶ 37; DRPSAF ¶ 27.) During that first meeting, Simons's discussion with Belcastro focused on his attendance record and absences. (PRDSF ¶¶ 39–40.) And following the meeting, Simons reached out to his colleagues at United to discuss his decision to request Belcastro's resignation, always citing Belcastro's attendance and reliability issues. (PRDSF ¶¶ 44–45; Defs.' Statement of Material Facts, Ex. 5, Simons Dep. Ex. 25, Dkt. No. 226-5; Defs.' Statement of Material Facts, Ex. 8, Melby Dep. Tr. at 56:11–18, Dkt. No. 226-8.) Notably, each of the colleagues to whom Simons reached out supported his decision. (PRSDF ¶ 44.)

Belcastro also claims that pretext can be inferred from Simons's failure to use certain United policies as a guideline for disciplining him. It is true that deviations from the employer's standard disciplinary procedures can support an inference of pretext. *Joll*, 953 F.3d at 931. Yet it is undisputed that, as a probationary pilot, Belcastro's employment was at-will. (PRDSF ¶ 10.) Consequently, he was not entitled to the disciplinary procedures provided to full-fledged pilots but instead could be dismissed at the sole discretion of Simons. (*Id.*) And because Belcastro was the first probationary pilot Simons dismissed during his tenure as Chief Pilot (DRPSAF ¶¶ 35–36; Defs.' Statement of Material Facts, Ex. 3, Simons Dep. Tr. at 43:17–44:1), there was no standard procedure against which the circumstances of Belcastro's dismissal could be compared. *Bagwe v.*

*Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 882 (7th Cir. 2016) (explaining that "there must be evidence of a specific policy that is regularly enforced and followed in similar situations" to show that an employer deviated from its own policies).

In sum, the Court finds that Belcastro's evidence falls well short of what is necessary to permit an inference of unlawful discrimination under *McDonnell Douglas*. Belcastro not only fails to satisfy the legitimate expectations and similarly situated elements of his prima facie case, but even if he could establish a prima facie case, he lacks evidence that could persuade a jury that United's reasons for his discharge were a pretext for discrimination.

### B. *Ortiz*

Although Belcastro fails to defeat summary judgment when his evidence is viewed under the *McDonnell Douglas* framework, *Ortiz* recognizes that the evidence viewed as a whole may nonetheless be sufficient to create a jury question. Here, that analysis requires the Court to revisit Belcastro's sole evidence of discriminatory intent: Simons's alleged statement referencing his Black friend who flies for Air Force One, purportedly made during the March 25 meeting at which Simons demanded Belcastro's resignation. The question for this Court is whether that single statement, viewed in context of the entire record, could allow a jury to conclude that Belcastro was discharged because he was white.

Simons's comment does not amount to a direct admission of an invidious racial motivation—for instance, Simons did not say he was requiring Belcastro to resign so his Black friend could take Belcastro's position. Nor did Simons directly address either Belcastro's race or the adverse employment decision. Rather, Simons lamented a different employment action— United's decision to hire Belcastro—and compared Belcastro unfavorably to Simons's Black friend. *See Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997) (explaining

that evidence must "speak directly to the issue of discriminatory intent" and "relate to the specific employment decision in question" to directly prove discriminatory intent). While Belcastro claims that Simons was referring to white people when he said he did not understand why "people like you" get hired, the "people like you" portion of Simons's remark was open-ended and not obviously racial. *See Golla v. Office of Chief Judge of Cook Cnty.*, 875 F.3d 404, 408 (7th Cir. 2017) (finding that the open-ended comment "all my life people have been standing in my way, and they all looked exactly like you" was not probative evidence of racial animus). Belcastro believes that "people like you" must have referred to white people given that it came on the heels of Simons's reference to his Black friend. But considering the context of Simons's entire comment and the undisputed evidence of Simons's issues with Belcastro's reliability and attitude, Simons's reference to his friend's race was more likely tangential to his larger point that Belcastro did not exhibit the qualities that United sought in a pilot. Thus, Simons's reference to "people like you" could be reasonably interpreted to mean people who, like Belcastro, were unreliable and had a poor attitude.

At minimum, Simons's comment was too ambiguous, by itself, to support a finding of unlawful discrimination. Although the comment is probative evidence, a "single 'bit' or 'piece' of evidence . . . is not enough to support a claim of discrimination." *Bagwe*, 811 F.3d at 885 (finding that a disparaging comment referencing the plaintiff's ethnicity made by one of the decisionmakers on the day of the plaintiff's termination was not sufficient, by itself, to defeat summary judgment); *see also Shager v. Upjohn Co.*, 913 F.2d 402 (7th Cir. 1990) ("The remark taken to be a slur may have been innocent and misunderstood; or it may have had no consequence . . . because it did not motivate even the person uttering it to act on it. . . . Even so, it may be relevant evidence, with greater or less probative value depending on the precise character

of the remark."). Rather, to create an issue for trial, there must be other evidence in the record suggesting that Simons's racial animus was a motivating factor for demanding Belcastro's resignation. *See Hong v. Child.'s Mem'l Hosp.*, 993 F.2d 1257, 1266–67 (7th Cir. 1993) (finding that biased remarks by decisionmaker unrelated to the adverse employment action were outweighed by the strength of the record evidence showing that the plaintiff's discharge was caused by her deficient job performance).

Here, the remainder of the record overwhelmingly weighs against drawing any inference of discrimination based solely on Simons's ambiguous remark. The undisputed evidence shows that Belcastro's final meeting with Simons was the first (and necessarily last) time he claims to have experienced racial discrimination while employed by United. (PRDSF ¶¶ 7–8, 30, 54.) Before that final meeting, Belcastro never perceived Simons as harboring any racial animus toward white people. (*Id.* ¶ 38, 44–45.) And while Simons had the sole authority to discharge Belcastro, his decision nonetheless was supported by numerous members of United's senior leadership, all of whom were white. (*Id.* ¶¶ 44–45.)

Further, as the Court discussed in connection with its *McDonnell Douglas* analysis, ample evidence in the record shows that Belcastro was not meeting United's legitimate expectations and there was no evidence that Simons's issues with his reliability and attitude were mere pretext. And while the Court found that Belcastro failed to identify any similarly situated comparators, even if the nine other probationary pilots with UTCs were similarly situated to Belcastro, it is notable that eight of them were white. (DRPSAF ¶ 37.) If Simons were, in fact, looking to replace white pilots of with people of color, one would expect that he would have taken action against the other white pilots who were supposedly similarly situated to Belcastro. *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 851 (7th Cir. 2010) (noting that, where several African-

Americans were investigated for workplace misconduct, "[i]f the defendants had racial animus, we would have expected them to take action against more than three of the African-American suspects"). Instead, only Belcastro was singled out for discharge, which suggests something other than Belcastro's race was the reason. And, assuming for present purposes that it was only Belcastro's UTC that led to his discharge, the record points to Belcastro's attitude—as Simons put it, his "playing games with the UPA"—as making the circumstances of his UTC stand out.

While Simons's mention of race when demanding Belcastro's resignation was not a direct admission of his discriminatory intent, it raised some suspicion that discrimination might be at play. But any suspicion is dispelled by the remainder of the record, which overwhelmingly corroborates Defendants' claim that Belcastro was asked to resign not because he was white, but because his reliability and attitude fell short of United's high standards for its pilots. For that reason, no reasonable jury could find for Belcastro on his Title VII claim and summary judgment is warranted in favor of Defendants.

## II.     Defamation

Belcastro also asserts an Illinois state-law claim for defamation based on the publication of a screenshot from his United master schedule revealing that he had been terminated. In Illinois, a "statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers the person in the eyes of the community or deters third persons from associating with [him]." *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). To prevail on a defamation claim, a plaintiff must show: (1) a false statement by the defendant about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006).

While Defendants contend that Belcastro's evidence fails to show that either United or Simons published the screenshot, the Court need not address that issue. Instead, Belcastro's defamation claim is fatally flawed because the statement that Belcastro's employment at United ended in termination is not false. "Truth is a defense to a defamation action and, to establish this defense, defendant need only show the truth of the 'gist' or 'sting' of the defamatory material." *Cianci v. Pettibone Corp.*, 698 N.E.2d 674, 678 (Ill. App. Ct. 1998). Put differently, only "substantial truth" is required. *Id.* Generally, substantial truth is a jury question but "where no reasonable jury could find that substantial truth had not been established, the question is one of law." *Id.* at 679.

Even accepting Belcastro's contention that "termination" as used in the screenshot could only be understood to mean "fired," the statement is substantially true. Indeed, Simons communicated to others at United that he decided to dismiss Belcastro but nonetheless would treat him "as humanely as possible" by offering him the opportunity to resign. (PRDSF ¶¶ 46, 50.) Accordingly, Belcastro was presented with two options: resign or immediate dismissal. Although it would be technically inaccurate to describe Belcastro's resignation as an involuntary "termination," the fact that a statement is not technically accurate in every detail does not make it defamatory. *E.g.*, *Coghlan v. Beck*, 984 N.E.2d 132, 146 (Ill. App. Ct. 2013). Essentially, Simons offered Belcastro the option to resign as a face-saving measure but made it clear to Belcastro that he would never again fly for United. (PRDSF ¶ 50; DRPSAF ¶ 33.) Thus, Belcastro was offered a binary choice with either option resulting in the end of his employment with United as of March 25, 2016.[5] (PRDSF ¶ 51; Defs.' Statement of Material Facts, Ex. 11, Simons Decl. Ex. C, Dkt. No. 226-11 (stating that Belcastro was separated from his employment at United "effective today"

---

[5] As discussed above, Title VII treats this choice as a constructive discharge, which constitutes an adverse employment action.

in draft Notice of Separation of Employment dated March 25, 2016").) It is therefore substantially true that Belcastro's employment with United ended in termination. *See Lerman v. Turner*, No. 10-CV-2169, 2013 WL 4495245, at *18 (N.D. Ill. Aug. 21, 2013) (holding that the employer's statement that the plaintiff had been terminated was substantially true even though, at the time, the plaintiff had only been suspended without pay, because there was no dispute that the plaintiff's employment had "effectively ended"). Consequently, Defendants are entitled to summary judgment on the defamation claim.

### III.     Tortious Interference with Employment

Finally, Belcastro asserts a claim against Simons for tortious interference with employment expectancy. In Illinois, such a claim requires the plaintiff to establish: "(1) that he had a reasonable expectation of continued employment; (2) that the defendant[] knew of the expectancy; (3) that [the defendant's] intentional and unjustified interference caused the termination of the employment; and (4) damages." *Harrison v. Addington*, 955 N.E.2d 700, 708 (Ill. App. Ct. 2011).

According to Belcastro, Simons unjustifiably interfered with Belcastro's employment prospects at United by having Belcastro's UTC reinstated after the Union had successfully removed it from his record. Putting aside the fact that the UTC was not, by itself, the reason for Belcastro's separation from United, Belcastro fails to demonstrate a disputed issue of material fact as to how Simons's actions were unjustified. Generally, "[a] corporate officer acting on behalf of a corporation can be held liable for interference with employment expectancy only where he places his own interests ahead of the corporation's interests." *Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 973 (N.D. Ill. 2014). By contrast, "[w]here an officer's action was taken pursuant to a legitimate interest of the company, the officer has immunity." *Id.*

Belcastro argues that Simons could not have been acting in United's legitimate interests because United ultimately settled Belcastro's grievance of the UTC and paid him backpay for the March 3, 2016 assignment. To Belcastro, the settlement proves the invalidity of the UTC and its reinstatement. But United made no admission of liability in settling and Belcastro was advised that United stood by its position as to the propriety of the UPA. (PRDSF ¶ 62; DRPSAF ¶ 25.) Moreover, before reinstating the UTC, Simons sought out the opinion of one of United's labor-contract specialists, and there is no evidence that Simons improperly pressured his colleague to reach a particular conclusion. Thus, no reasonable jury could conclude from the evidence that Simons's conduct in reinstating the UTC was improper. Defendants' motion for summary judgment is therefore granted as to the tortious interference with employment claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 223) is granted. The Clerk will enter Judgment in favor of Defendants.

ENTERED:

Dated:  March 28, 2022

_____
Andrea R. Wood
United States District Judge